## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### West Palm Beach Division

**ADRIAN REED,**                                        CASE NO.: 9:24cv81482

     *Plaintiff,*

**v.**

**BRIDGECREST CREDIT COMPANY,**
**LLC, TRANS UNION, LLC, EXPERIAN**
**INFORMATION SOLUTIONS, INC. and**
**EQUIFAX INFORMATION SERVICES**
**LLC,**

     *Defendants,*

_____/

### PLAINTIFF'S FIRST AMENDED COMPLAINT WITH JURY DEMAND

1.      Plaintiff, Adrian Reed (hereinafter "Plaintiff" or "Mr. Reed"), brings this action against Defendants Bridgecrest Credit Company, LLC ("Bridgecrest"), Trans Union, LLC ("Trans Union"), Experian Information Solutions, Inc. ("Experian") and Equifax Information Services LLC ("Equifax") for violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et. seq.* (hereinafter "FCRA").

2.      Plaintiff further alleges violations of the Florida Consumer Collection Practices act, Florida Statute §559.72 *et. seq.* (the "FCCPA") against Bridgecrest and states the following in support:

### JURISDICTION AND VENUE

3.      This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States.

4.      Venue here is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in Palm Beach County, Florida.

5.      This Court has supplemental jurisdiction to hear all state law claims that are pleaded herein or that may subsequently arise pursuant to 28 U.S.C. § 1367.

## PARTIES

6.      Plaintiff Adrian Reed is a natural person who, at all times relevant to this action is and was a resident of Palm Beach County, Florida and is a "consumer" as defined by 15 U.S.C. § 1681a(c).

7.      Defendant Bridgecrest is an Arizona limited liability company registered to conduct business in the State of Florida with a principal place of business at 7465 E. Hampton Avenue, Mesa, AZ 85209.

8.      Bridgecrest uses instrumentalities of interstate commerce for the purpose of furnishing information on specific trade accounts to the three national consumer reporting agencies, Trans Union, Equifax, and Experian (collectively "credit reporting agencies" or "CRAs").

9.      These instrumentalities of interstate commerce are largely electronic, written, or telephonic communications which has effects on consumers and their credit reports within the State of Florida.

10.      Defendant Trans Union is a limited liability company incorporated under the laws of the State of Delaware, whose members are citizens of the state of Illinois. Trans Union is authorized to do business in and regularly conducts business in the State of Florida and engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports as defined in 15 U.S.C. § 1681d to third parties.

11.      Defendant, Experian is an Ohio corporation incorporated under the laws of the State of Delaware. Experian is authorized to do business in the State of Florida and engages in the

2

business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports as defined in 15 U.S.C. § 1681d to third parties.

12.     Defendant, Equifax is a Georgia limited liability company incorporated under the laws of the State of Delaware. Equifax is authorized to do business in the State of Florida and engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports as defined in 15 U.S.C. § 1681d to third parties.

## STATUTORY FRAMEWORK

### THE FCRA

13.     The Fair Credit Reporting Act, 15 U.S.C. §1681 *et. seq.*, was enacted in 1970 for the purpose of regulating the collection, dissemination, and use of consumer credit information.

14.     Congress found that "[i]naccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system." *See* 15 U.S.C. §1681(a)(1).

15.     "The aim of the Fair Credit Reporting Act is to see that the credit reporting system serves the consumer as well as the industry. The consumer has a right to information which is accurate; he has a right to correct inaccurate or misleading information; he has a right to know when inaccurate information is entered into his file; he has a right to see that the information is kept confidential and is used for the purpose for which it is collected; and he has a right to be free from unwarranted invasions of his personal privacy." The Fair Credit Reporting Act seeks to secure these rights." Hearings on S. 823 Before the Subcomm. on Financial Institutions of the S. Comm. on Banking and Currency, 91st Cong. 2 (1969).

16.     A "furnisher of information" provides information about consumers' credit history to credit reporting agencies. *See* 15 U.S.C. §1681s-2.

17.     "Furnishers of information" under the FCRA, pursuant to 15 U.S.C. §1681s-2(b) to conduct a reasonable investigation into each of the written disputes that it receives from the credit reporting agencies. *See Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1302 (11th Cir. 2016).

18.     Congress also found that "[c]onsumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers" and that "[t]here is a need to insure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy." *See* 15 U.S.C. § 1681(a)(3),(4).

19.     The FCRA requires credit reporting agencies to "follow reasonable procedures to assure maximum possible accuracy of" consumer reports. 15 U.S.C. § 1681e(b). If a consumer disputes information contained in their credit report, the FCRA requires a credit reporting agency to "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer or reseller." *See* 15 U.S.C.S. § 1681i(a)(1)(A).

20.     In performing the reinvestigation, the FCRA requires a credit reporting agency to "review and consider all relevant information submitted by the consumer in the period described in paragraph (1)(A) with respect to such disputed information." *See* 15 U.S.C.S. § 1681i(a)(4).

21.     If the disputed information is inaccurate or incomplete or cannot be verified, the consumer reporting agency "shall…(i)  promptly delete that item of information from the file of the consumer, or modify that item of information, as appropriate, based on the results of the

reinvestigation; and (ii)  promptly notify the furnisher of that information that the information has been modified or deleted from the file of the consumer." *See* 15 U.S.C. § 1681(a)(5)(A)(i),(ii).

22.     The FCRA provides a private right of action against any person that violates the provisions of the FCRA. *See* 15 U.S.C. §§ 1681o, 1691n.

23.     If the violation is negligent, the FCRA allows the consumer to recover actual damages (§ 1681o(a).

24.     If the violation is willful, the consumer may recover any actual damages or statutory damages from not less than $100.00 and not more than $1,000. *See* 15 U.S.C. § 1681n(a).

25.     A consumer who succeeds on a FCRA action is also entitled to recover their costs and reasonable attorney fees.  15 U.S.C. §§ 1681n(a)(3), 1681o(a)(2).

26.     Under the FCRA, the term "consumer report" generally refers to any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for:

      a.     credit or insurance to be used primarily for personal, family, or household purposes;

      b.     employment purposes; or

      c.     any other purpose authorized under section 1681b of this title.

*See* 15 U.S.C. § 1681a(d)(1).

27.      The terms "consumer report", "credit report", and "consumer credit report" are used synonymously herein.

_National CRAs and Furnishers Communicate Consumer Disputes and Responses via the E-Oscar Reporting Platform_

28.     The FCRA requires credit reporting agencies to implement an automated reinvestigation system through which furnishers of information to the credit reporting agencies may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(D).

29.     To comply with the automated dispute reinvestigation requirements of the FCRA, Trans Union, Equifax, and Experian along with Innovis Data Solutions, Inc., developed and implemented a browser-based software system that allows the credit reporting agencies to electronically notify furnishers quickly and easily of disputed credit reporting information, and for furnishers to quickly and easily respond to such disputes following the furnisher's investigation of the disputed information.

30.     The system is commonly referred to as e-OSCAR (Online Solution for Complete and Accurate Reporting) and was designed to be Metro 2 compliant. *See* http://www.e-oscar.org/ (last accessed November 18, 2024).

31.     The e-OSCAR system primarily supports Automated Credit Dispute Verification ("ACDV") and Automated Universal Data Form ("AUD") processing, as well as other consumer-dispute-related processes. *See* https://www.e-oscar.org/gettingstarted (last accessed November 18, 2024).

32.     The credit reporting agencies provide notice of a consumer's dispute to data furnishers in the ACDV format and forward the ACDV to the furnisher through e-OSCAR.

33.     If a furnisher's investigation of a consumer's dispute determines that the information in dispute is incomplete or inaccurate, the FCRA requires the furnisher to correct the information not only with the credit reporting agency that sent the ACDV, but with all other credit

reporting agencies to whom the furnisher reported that information. *See* 15 U.S.C. § 1681s-2(b)(1)(D).

34.     The e-OSCAR system facilitates the furnisher's compliance with 15 U.S.C. § 1681s-2(b)(1)(D) by sending a "Carbon Copy" of an ACDV response "to each CRA with whom the [furnisher] has a reporting relationship" in addition to the response to the initiating credit reporting agency. *See* https://www.e-oscar.org/gettingstarted (last accessed November 18, 2024).

35.     Additionally, a furnisher can manually correct a tradeline with a credit reporting agency other than the one that initiated a dispute by sending an AUD within e-OSCAR.

36.     Trans Union, Experian, and Equifax each require data furnishers that report to them respectively to register with and use e-OSCAR, and state that e-OSCAR is "in compliance with FCRA and Metro 2 standards." See, https://www.transunion.com/data-reporting/support-teams  (last accessed November 18, 2024).

*Credit Risk Scores aka Credit Scores*

37.     The Fair Isaac Corporation credit risk scoring system, commonly referred to as "FICO", is the leading credit scoring system and utilizes data reported by the credit reporting agencies. *See* https://www.myfico.com/credit-education/credit-scores (last visited November 18, 2024).

38.     The Fair Isaac Corporation uses the data in consumer reports to calculate consumers' credit scores (also known as credit risk scores). *Id.*

39.     The term "credit score" is a numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges a loan to predict the likelihood of certain credit behaviors, including default. Consumer Financial Protection Bureau, Supervision and Examination Manual, Version 2(October 2012), p. 99, archived at

https://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf

(last accessed on November 18, 2024).

40.     FICO scores are calculated from five main categories of credit data in a consumer's credit report. Those categories, and their weighted values, are as follows: payment history accounts for 35% of a consumer's FICO score; debt/amounts owed accounts for 30% of a consumer's FICO score; age/length of credit history accounts for 15% of a consumer's FICO score; new credit/recent inquiries accounts for 10% of a consumer's FICO score; and mix of accounts/types of credit accounts for 10% of a consumer's FICO score. *See* https://www.myfico.com/credit-education/whats-in-your-credit-score (last accessed November 18, 2024).

41.     The cost of credit (e.g., interest rates, fees, etc.), the availability of credit, ratings for insurance products, and even unsolicited credit offers, such as the opportunity to refinance a mortgage at a lower interest rate, extended financing periods and lower rate auto loans, and even zero-percent financing credit offers for in-store credit lines, are all, by and large, driven by a consumer's credit score.

42.     Inaccurate or incorrect credit reporting very often results in a lower FICO and other credit scoring model scores, and thus higher costs of credit, diminished opportunity, and less purchasing power for consumers.

43.     There is no established rule or threshold for classifying the significance of a credit score change as minor or major because the impact of a change in score is dependent on the current score. For example, a twenty-five-point change in a credit score that keeps the consumer in a particular credit risk category may not have a large impact on the person's likelihood of receiving credit. However, a one-point change in credit score that moves the consumer from one risk tier to

the next may have a large impact on the consumer's access to credit or the products and rates the consumer is able to secure.

44.     The Fair Isaac Corporation states that inaccurate or incorrect information on a consumer's credit report can hurt their score. *See* https://www.myfico.com/credit-education/questions/fix-errors-on-credit-report   archived at https://perma.cc/9TQN-S5WP (last visited November 18, 2024).

*The CDIA Metro 2 Credit Reporting Standards*

45.     The reporting of consumer credit information, by credit reporting agencies and data furnishers, is the foundation of credit risk scoring and impacts the financial lives of consumers by giving them access to loans and bank products that they need. *See* https://www.cdiaonline.org/for-consumers/credit-reporting-overview/ (last visited November 18, 2024).

46.     Moreover, the significance of credit reporting and the value attached to one's "credit in this day and age is one of his most valuable assets and without it, a substantial portion of the American people would be without their homes, washing machines, refrigerators, automobiles, television sets, and other mechanical paraphernalia that are now regarded as necessities of life." *See Am. Fire & Cas. Co. v. Davis*, 146 So. 2d 615, 619 (Fla. 1st DCA 1962)."

47.     The Consumer Data Industry Association ("CDIA") is an international trade association, representing over 140 members involved in credit reporting, mortgage reporting, check verification, tenant and employment screening, collection services, and fraud verification services, and the CDIA is active in both federal and state legislative affairs, public relations, education, and the promulgation of industry standards.

48.     Because consumer credit reporting information is such sensitive data that has far-reaching implications for most, if not all, consumers, the CDIA works together with credit reporting agencies to develop, maintain and enhance industry-standard reporting formats and guidelines.

49.     On May 20, 2015, Ohio Attorney General Mike DeWine and thirty (30) other state attorneys general announced a national settlement ("The Settlement") with the credit reporting agencies. Attorney General DeWine Announces Major National Settlement with Credit Reporting Agencies, Ohio Att'y Gen. (May 20, 2015), https://www.ohioattorneygeneral.gov/Media/News-Releases/May-2015/Attorney-General-DeWine-Announces-Major-National-s#:~:text=We%20are%20announcing%20a%20comprehensive,because%20of%20an%20inaccurate%20credit (last visited November 18, 2024).

50.     The Settlement implemented numerous reporting standards, including the Metro 2, data reporting format. See Assurance of Voluntary Compliance/Assurance of Voluntary Discontinuance, In the Matter of Equifax Info. Servs. L.L.C., Experian Info. Sols., Inc., and TransUnion L.L.C., § IV (E)(2)(May 20, 2015).

51.     To further assist credit reporting agencies and data furnishers with performing their due diligence and reporting accurate, complete, and timely data, in satisfaction of the FCRA's legal requirements, the CDIA offers extensive training, education, and support to credit reporting agencies and data furnishers.

52.     The CDIA's extensive training and support offerings include FCRA certification programs for both credit reporting agencies and data furnishers, to assist each in maintaining compliance with FCRA regulations.

53.     If the standardized methods proscribed by the CDIA are not followed, FCRA certification can be revoked for failure to adhere to such standards.

54.     The Metro 2 Format Task Force is comprised of representatives from Equifax, Experian, Innovis, and Trans Union, and is supported by the CDIA. Metro 2 Format Task Force's mission is to provide a standardized method for the reporting of accurate, complete, and timely data, and has developed the Metro 2 standards. *See* https://www.cdiaonline.org/metro-2/ (last visited November 18, 2024).

55.     To ensure compliance with the FCRA, and in furtherance of its mission, the Metro 2 Format Task Force has developed an industry standard (the "Metro2 standard") for reporting consumer accounts that is "designed to standardize a wide range of credit information while complying with federal laws and regulations for credit reporting." *Id.*

56.     15 U.S.C. § 1681s-2(a)(2) requires furnishers of information to regularly correct and update the information they previously provided to consumer reporting agencies, to make sure the information is complete and accurate. Similarly, upon receiving notice from a consumer reporting agency of a consumer's dispute, 15 U.S.C. § 1681s-2(b)(1) requires furnishers of information to conduct reasonable investigations of a consumer's dispute of the completeness or accuracy of any information provided by the furnisher of information to a consumer reporting agency.

57.     15 U.S.C. § 1681e(b) requires consumer reporting agencies to follow reasonable procedures to assure maximum possible accuracy of information concerning the individual about whom a report relates. Similarly, 15 U.S.C. § 1681i(a)(1) requires consumer reporting agencies to conduct reasonable reinvestigations of a consumer's dispute of the completeness or accuracy of any item of information contained in the consumer's file.

58.     The uniform adoption and implementation of the Metro 2 standards is the primary vehicle by which credit reporting agencies and furnishers ensure compliance with their respective duties to maintain complete and accurate information under the FCRA.

59.     The Metro 2 standards provide uniformity in the reporting and interpretation of credit data, including credit risk scoring.

60.     The Metro 2 standards are documented in the Credit Reporting Resource Guide ("CRRG"), an industry-standard publication produced and distributed by the CDIA.

61.     As an integral aspect of its duties under the FCRA, Bridgecrest is required to have in place adequate and reasonable policies and procedures for handling and investigation of disputed information.

62.     At all times relevant hereto, Bridgecrest adopted and implemented the Metro 2 format as a means of fulfilling its duties under the FCRA.

63.     Furthermore, at all times relevant hereto, Bridgecrest incorporated, warranted, and or represented to the credit reporting agencies to which it reported that it had adopted and implemented the Metro 2 format for its reporting of consumer data, and would otherwise comply with Metro 2 and CDIA guidelines in its reporting of consumer information.

64.     As an integral aspect of its duties under the FCRA, Trans Union required to have in place adequate and reasonable policies and procedures to assure the maximum possible accuracy of information concerning individuals about whom Trans Union produces reports; the requirement to maintain reasonable procedures extends to Trans Union's handling and reinvestigation of disputed information.

65.     At all times relevant hereto, Trans Union adopted and implemented the Metro 2 format as a means of fulfilling its duties under the FCRA.

66. At all times relevant hereto, Trans Union has required all entities to whom it grants consumer information reporting rights and access to adhere to the Metro 2 reporting guidelines as a condition of such ability and access.

67. As an integral aspect of its duties under the FCRA, Experian is required to have in place adequate and reasonable policies and procedures to assure the maximum possible accuracy of information concerning individuals about whom Experian produces reports; the requirement to maintain reasonable procedures extends to Experian's handling and reinvestigation of disputed information.

68. At all times relevant hereto, Experian adopted and implemented the Metro 2 format as a means of fulfilling its duties under the FCRA.

69. At all times relevant hereto, Experian has required all entities to whom it grants consumer information reporting rights and access to adhere to the Metro 2 reporting guidelines as a condition of such ability and access.

70. As an integral aspect of its duties under the FCRA, Equifax is required to have in place adequate and reasonable policies and procedures to assure the maximum possible accuracy of information concerning individuals about whom Equifax produces reports; the requirement to maintain reasonable procedures extends to Equifax's handling and reinvestigation of disputed information.

71. At all times relevant hereto, Equifax adopted and implemented the Metro 2 format as a means of fulfilling its duties under the FCRA.

72. At all times relevant hereto, Equifax has required all entities to whom it grants consumer information reporting rights and access to adhere to the Metro 2 reporting guidelines as a condition of such ability and access.

**The FCCPA**

73.     The FCCPA's goal is to "provide the consumer with the most protection possible." *See LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1192 (11th Cir. 2010) (citing Fla. Stat. § 559.552).

74.     The FCCPA provides that no person shall "claim, attempt, or threaten to enforce a debt when such person knows that the debt is not legitimate, or assert the existence of some other legal right when such person knows that the right does not exist." *See* Fla. Stat. § 559.72(9).

75.     "The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper, including enjoining the defendant from further violations of this part." *See* Fla. Stat. §559.77(2).

76.     As consumers, Plaintiff has a private right of action against Bridgecrest pursuant to Florida Statute §559.77(2), which provides that "[a]ny person who fails to comply with any provision of s. 559.72 is liable for actual damages and for additional statutory damages . . . not exceeding $1,000, together with court costs and reasonable attorney's fees incurred by the plaintiff." (omissions added).

## FACTUAL ALLEGATIONS

77.     On or about November 28, 2022, Plaintiff entered into a Retail Purchase Agreement with Carvana, LLC ("Carvana") to purchase a 2016 Maserati Ghibli Sedan (the "Vehicle").

78.     Defendant Bridgecrest provided the financing for the purchase of the Vehicle in the amount of $29,441.60.

79.     The Retail Purchase Agreement provided that, Plaintiff may return the Vehicle and terminate the Retail Purchase Agreement under the Carvana Vehicle Return Program by following specific instructions.

80.     On or about November 28, 2022, after taking possession of the Vehicle, Plaintiff became aware that the Vehicle was not in the condition that Carvana described.

81.     For this reason, Plaintiff mailed a Rescission and Tender Notice dated November 28, 2022 to Carvana requesting to terminate the Retail Purchase Agreement and for Carvana to return his down payment of $3,900.

82.     Shortly thereafter, Plaintiff began contacting Carvana to confirm that his Rescission and Tender Notice was received and to make arrangements to surrender the Vehicle to Carana.

83.     However, Carvana's employees refused to cooperate with Plaintiff and honor the terms of the Carvana Vehicle Return Program.

84.     Carvana's employees informed Plaintiff that, in order for Plaintiff to be able to terminate the Retail Purchase Agreement, Plaintiff was required to provide Carvana with a demand letter from an attorney.

85.     In an attempt to comply with Carvana's request, Plaintiff retained the services of attorney Brett L. Sheptow of Glantzlaw who sent a letter dated January 19, 2023 to Carvana stating that Plaintiff has complied with the Carvana Vehicle Return Program and requested that Carvana do the same.

86.     Despite Plaintiff's exhaustive efforts, Carvana refused to refund Plaintiff's down payment and make arrangements from Plaintiff to return the Vehicle to Carvana.

87.     On or about March 27, 2023, Defendant Bridgecrest repossessed the Vehicle and began reporting that repossession on Plaintiff's Trans Union, Experian and Equifax credit reports.

88.     Plaintiff then began disputing the late payment history and the repossession notation associated with the Bridgecrest account with the credit reporting agencies because this information was incorrect, inaccurate and/or materially misleading since Plaintiff made diligent effort to comply with the Carvana Vehicle Return Program and Carvana did not.

89.     On or about May 17, 2023, Plaintiff mailed dispute letters to Trans Union, Experian and Equifax disputing the late payment history and the repossession notation with a courtesy copy of each letter also mailed to Bridgecrest and Carvana ("May 2023 dispute(s)").

90.     With Plaintiff's May 2023 dispute(s), he provided Defendants with a copy of his driver's license, the Retail Purchase Agreement, the Rescission and Tender Notice and the letter from attorney Brett L. Sheptow of Glantzlaw.

91.     Upon information and belief, the credit reporting agencies also forwarded Plaintiff's May 2023 dispute(s) to Bridgecrest.

92.     Defendant Experian provided Plaintiff with investigation results dated June 3, 2023 indicating its intent to continue reporting the late payment history and repossession notation associated with the Bridgecrest account.

93.     Defendants Trans Union and Equifax failed to provide Plaintiff with any investigation results at all related to his May 2023 dispute(s) and continued to report the late payment history and repossession notation associated with the Bridgecrest account.

94.     In or around October 2023, Plaintiff again disputed the inaccurate information associated with the Bridgecrest account with Defendants Trans Union and Equifax ("October 2023 dispute(s)").

95.     Defendant Trans Union sent Plaintiff investigation results dated October 14, 2023 indicating its intent to continue reporting the late payment history and repossession notation associated with the Bridgecrest account.

96.     Defendant Equifax sent Plaintiff investigation results dated October 11, 2023 indicating its intent to continue reporting the late payment history and repossession notation associated with the Bridgecrest account.

97.     Defendants further failed to notate that Plaintiff was dispute the accuracy of the Bridgecrest account.

98.     On or about December 8, 2023, Plaintiff mailed a dispute letters to Trans Union disputing the late payment history and the repossession notation with a courtesy copy of the letter also mailed to Bridgecrest and Carvana ("December 2023 dispute").

99.     With Plaintiff's December 2023 dispute, he provided Trans Union with a copy of his driver's license, the Retail Purchase Agreement, the Rescission and Tender Notice and the letter from attorney Brett L. Sheptow of Glantzlaw.

100.    Additionally, Plaintiff requested that, if Trans Union did not correct the late payment history and repossession notation, that Trans Union include the following consumer statement on his credit reports: "I dispute the reported late payments and repossession status on this account. The purchase agreement was rescinded within the proper timeframe and terms of their return policy, but they refused to take the vehicle back. Therefore, the reporting of this account is inaccurate and should not be taken into consideration by future creditors. Please ask me for proof that I returned the car, so I can show you I complied."

101.    Upon information and belief, the Trans Union also forwarded Plaintiff's December 2023 dispute(s) to Bridgecrest.

102.    On December 21, 2023, Bridgecrest responded to Plaintiff directly by stating he still owed the past due balance despite his disputes to the CRAs and that he needed to make arrangements to pay that past due balance.

103.    Defendant Trans Union sent Plaintiff investigation results dated December 22, 2023 indicating its intent to continue reporting the late payment history and repossession notation associated with the Bridgecrest account.

104.    Defendants Trans Union and Bridgecrest further failed to notate that Plaintiff was dispute the accuracy of the Bridgecrest account.

105.    Furthermore, Defendant Trans Union also failed to add Plaintiff's consumer statement to his credit reports as requested in Plaintiff's December 2023 dispute.

106.    On or about September 12, 2024, Plaintiff again mailed dispute letters to Trans Union, Experian and Equifax disputing the late payment history and the repossession notation with a courtesy copy of each letter also mailed to Bridgecrest and Carvana ("September 2024 dispute(s)").

107.    With Plaintiff's September 2024 dispute(s), he provided Defendants with a copy of his driver's license, the Retail Purchase Agreement, the Rescission and Tender Notice and the letter from attorney Brett L. Sheptow of Glantzlaw.

108.    Additionally, Plaintiff requested that, if Defendants did not correct the late payment history and repossession notation, that Trans Union, Experian and Equifax include the following consumer statement on his credit reports: "I dispute the reported late payments and repossession status on this account. The purchase agreement was rescinded within the proper timeframe and terms of their return policy, but they refused to take the vehicle back. Therefore,

the reporting of this account is inaccurate and should not be taken into consideration by future creditors. Please ask me for proof that I returned the car, so I can show you I complied."

109.     Upon information and belief, the credit reporting agencies also forwarded Plaintiff's September 2024 dispute(s) to Bridgecrest.

110.     Defendants Trans Union failed to provide Plaintiff with any investigation results at all related to his September 2024 dispute(s) and continued to report the late payment history and repossession notation associated with the Bridgecrest account.

111.     Defendants Trans Union and Bridgecrest further failed to notate that Plaintiff was dispute the accuracy of the Bridgecrest account.

112.     Furthermore, Defendant Trans Union also failed to add Plaintiff's consumer statement to his credit reports as requested in Plaintiff's September 2024 dispute(s).

113.     Defendant Experian provided Plaintiff with investigation results dated October 10, 2024 indicating its intent to continue reporting the late payment history and repossession notation associated with the Bridgecrest account.

114.     Defendant Experian also failed to add Plaintiff's consumer statement to his credit reports as requested in Plaintiff's September 2024 dispute(s).

115.     Defendants Equifax failed to provide Plaintiff with any investigation results at all related to his September 2024 dispute(s) and continued to report the late payment history and repossession notation associated with the Bridgecrest account.

116.     Defendants Equifax and Bridgecrest further failed to notate that Plaintiff was dispute the accuracy of the Bridgecrest account.

117.     Furthermore, Defendant Equifax also failed to add Plaintiff's consumer statement to his credit reports as requested in Plaintiff's September 2024 dispute(s).

118.     After receiving Plaintiff's multiple dispute letters, Defendants Trans Union, Equifax, Experian and Bridgecrest's continued reporting of the late payment history and repossession notation without including that Plaintiff was disputing the account created an inaccurate and misleading representation of Plaintiff's credit risk to existing and potential creditors.

119.     Additionally, Defendants Trans Union, Equifax and Experian continued reporting of the late payment history and repossession notation without including that Plaintiff's consumer statements in subsequent reports these Defendants prepare about Plaintiff also created an inaccurate and misleading representation of Plaintiff's credit risk to existing and potential creditors.

120.     On or about April 11, 2024, Capital One denied Plaintiff's application for credit limit increase based on information it obtained about him from Equifax which included the inaccurate and/or misleading information related to the Bridgecrest account.

121.     On or about April 15, 2024, Sparrow Financial, Inc. denied Plaintiff's application for credit based on information it obtained about him from Trans Union which included the inaccurate and/or misleading information related to the Bridgecrest account.

122.     On or about April 16, 2024, Cross River Bank denied Plaintiff's application for credit based on information it obtained about him from Equifax which included the inaccurate and/or misleading information related to the Bridgecrest account.

123.     On or about April 16, 2024, Aspire/The Bank of Missouri denied Plaintiff's application for credit based on information it obtained about him from Equifax which included the inaccurate and/or misleading information related to the Bridgecrest account.

124. On or about April 16, 2024, Imagine Credit/WebBank denied Plaintiff's application for credit based on information it obtained about him from Equifax which included the inaccurate and/or misleading information related to the Bridgecrest account.

125. On or about April 30, 2024, Headway Capital, LLC denied Plaintiff's application for credit based on information it obtained about him from Trans Union which included the inaccurate and/or misleading information related to the Bridgecrest account.

126. On or about May 1, 2024, Foursight Capital, LLC denied Plaintiff's application for credit based on information it obtained about him from Trans Union which included the inaccurate and/or misleading information related to the Bridgecrest account.

127. On or about June 10, 2024, Credit Acceptance denied Plaintiff's application for credit based on information it obtained about him from Experian which included the inaccurate and/or misleading information related to the Bridgecrest account.

128. On or about July 29, 2024, Bank of America denied Plaintiff's application for credit based on information it obtained about him from Experian which included the inaccurate and/or misleading information related to the Bridgecrest account.

129. On or about July 31, 2024, Carputty denied Plaintiff's application for credit based on information it obtained about him from Experian which included the inaccurate and/or misleading information related to the Bridgecrest account.

130. On or about August 13, 2024, Concora Credit denied Plaintiff's application for credit based on information it obtained about him from Trans Union which included the inaccurate and/or misleading information related to the Bridgecrest account.

131.     On or about August 22, 2024, State Department Federal Credit Union denied Plaintiff's application for credit based on information it obtained about him from Experian which included the inaccurate and/or misleading information related to the Bridgecrest account.

132.     On or about August 23, 2024, WebBank denied Plaintiff's application for credit based on information it obtained about him from Experian which included the inaccurate and/or misleading information related to the Bridgecrest account.

133.     Courts have regularly held that allegations of lower credit scores, taken as true, are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III. *See Pedro v. Equifax, Inc.*, 868 F.3d 1275 (11th Cir. 2017) ("[H]er credit score dropped 100 points as a result of the challenged conduct. Because Pedro alleged that she suffered an injury in fact, she has standing to pursue her complaint."); *See Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583 (7th Cir. 2016) (standing where Plaintiffs alleged that they "have suffered damage to their credit and been forced to pay Ocwen greater payments and a higher interest rate"); *See Santangelo v. Comcast Corp.*, 162 F. Supp. 3d 691 (N.D. Ill. 2016) ("a depleted credit score is sufficient to constitute an injury-in-fact for the purposes of establishing Article III standing"); *See Binns v. Ocwen Loan Servicing, LLC*, No. 14- 01764, 2015 U.S. Dist. LEXIS 132743, 2015 WL 5785693, at *9 (S.D. Ind. Sept. 30, 2015) ("injuries to plaintiffs' credit scores and reputations were considered intangible harms"); *See Rothman v. U.S. Bank Nat'l Ass'n*, No. 13-03381, 2014 U.S. Dist. LEXIS 141100, 2014 WL 4966907, at *5 (N.D. Cal. Oct. 3, 2014) ("Injury to a credit score is sufficient to constitute 'actual damages'"); *See Green v. RentGrow, Inc.*, No. 2:16cv421, 2016 U.S. Dist. LEXIS 166229 ("A decrease in credit score may still establish an injury in fact sufficient to confer standing"); *See Adams v. Fifth Third Bank*, No. 3:16-CV-00218-TBR, 2017 U.S. Dist. LEXIS 18932 (W.D. Ky. Feb. 9, 2017) ("Plaintiffs' allegations of lower credit scores … are

sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III."); and,

*See Coulbertson v. Experian Info. Sols., Inc.*, No. 16-cv-05672-RS, 2017 U.S. Dist. LEXIS 69484 (N.D. Cal. Mar. 24, 2017) ("At a minimum, Coulbertson has alleged a sufficient injury-in-fact through her claim that her credit score suffered as a result of the credit report she disputes").

<u>**COUNT I – VIOLATIONS OF 15 U.S.C. §1681s-2(b)**</u>
<u>**AGAINST BRIDGECREST**</u>

134.    Plaintiff incorporates by reference paragraphs 1 – 9 and 13 - 133 as if fully stated herein.

135.    Bridgecrest is a furnisher under the FCRA because it provides consumer credit information concerning consumers to credit reporting agencies.

136.    Bridgecrest violated 15 U.S.C. §1681s-2(b) by failing to fully and properly investigate Plaintiff's disputes when it failed to review all relevant information provided by the credit reporting agencies.

137.    As a result of Bridgecrest's violations of the FCRA, Plaintiffs have been damaged.

138.    Plaintiffs' damages include damages for mental and emotional distress associated with the Bridgecrest account remaining on his credit reports following their disputes, loss of credit and the opportunity to benefit from credit, time spent dealing with credit report disputes, and the costs associated with disputes.

139.    Bridgecrest negligently violated FCRA entitling Plaintiff to recover under 15 U.S.C. §1681o.

140.    Additionally, Bridgecrest committed a willful violation of the FCRA entitling Plaintiff to recover under 15 U.S.C. §1681n(a).

141.    Plaintiff is entitled to an award of prevailing party attorney's fees pursuant to 15 U.S.C. §1681.

WHEREFORE, Plaintiff prays this Honorable Court to enter the following relief against Bridgecrest in the form of: Actual damages in an amount to be determined by the jury; Punitive damages in an amount to be determined by the jury; Statutory damages as determined by the Court; Attorneys' fees, litigation expenses and costs; Interest as permitted by law; and such other and further relief including as the Court deems equitable and just under the circumstances.

## COUNT II – VIOLATIONS OF FLA. STAT. §559.72(9) AGAINST BRIDGECREST

142.    Plaintiff incorporates by reference paragraphs 1 – 9, 73 – 87, and 102 as if fully stated herein.

143.    At all relevant times to this action, Bridgecrest is subject to and must abide by the laws of Florida, including Fla. Stat. §559.72.

144.    Bridgecrest violated Florida Statute § 559.72(9) by claiming, attempting, or threatening to enforce a debt when Bridgecrest knew that the debt was not legitimate, or asserting the existence of some other legal right when Bridgecrest knew that right did not exist.

145.    Specifically, Bridgecrest continued its attempts to collect the debt at issue after being notified that Plaintiff did not owe a debt to Bridgecrest.

146.    "Any person who fails to comply with any provision of § 559.72 is liable for actual damages and for additional statutory damages as the court may allow, but not exceeding $1,000, together with court costs and reasonable attorney's fees incurred by the plaintiff. In determining the defendant's liability for any additional statutory damages, the court shall consider the nature of the defendant's noncompliance with § 559.72, the frequency and persistence of the noncompliance, and the extent to which the noncompliance was intentional." Fla. Stat. 559.77(2) (emphasis added).

147.   As a result of Bridgecrest's violations, Plaintiff suffered damages, including but not limited to, time spent addressing Bridgecrest's illegal collection practices and related emotional distress.

WHEREFORE, Plaintiff prays this Honorable Court to enter the following relief against Bridgecrest for: actual damages, statutory damages, and punitive damages pursuant to Fla. Stat. §559.77; attorneys' fees, litigation expenses and costs of the instant suit; and such other or further relief as the Court deems proper.

## COUNT III - VIOLATIONS OF 15 U.S.C. §1681i
## AGAINST TRANS UNION

148.   Plaintiffs incorporate by reference paragraphs 1, 3 – 5, 10, 13 – 72, 89 – 91, 93, 95, 97 – 101, 103 – 112, 118, 119, 121. 125, 126, 130, and 133 as if fully stated herein.

149.   At all times relevant hereto, Trans Union is and was a "consumer reporting agency" as provided for under the FCRA.

150.   At all times relevant hereto, Plaintiff was a "consumer" as provided for under the FCRA.

151.   Trans Union violated 15 U.S.C. § 1681i by failing to correct, update or delete inaccurate information in Plaintiff's credit file after receiving actual notice of inaccuracies contained therein. Trans Union also failed to add the consumer statement to Plaintiff's credit file, despite multiple requests.

152.   Additionally, Trans Union unreasonably relied on information provided by Bridgecrest, when readily verifiable information was provided by Plaintiff in the disputes placing Trans Union on notice that Bridgecrest's credit information was inaccurate and unreliable.

153.   Trans Union's acts or omissions were willful, rendering it liable to Plaintiff for punitive damages pursuant to 15 U.S.C. §1681n.

154.     Alternatively, Trans Union negligently violated FCRA entitling Plaintiff to recover under 15 U.S.C. §1681o.

155.     As a result of Trans Union's FCRA violations, Plaintiff has suffered damages including but not limited to, damages for mental and emotional distress associated with the Bridgecrest account remaining on his credit reports following their dispute, loss of credit and the opportunity to benefit from credit, time spent dealing with credit report disputes, and the costs associated with disputes.

WHEREFORE, Plaintiff prays this Honorable Court to enter the following relief against Trans Union in the form of: Actual damages in an amount to be determined by the jury; Punitive damages in an amount to be determined by the jury; Statutory damages as determined by the Court; Attorneys' fees, litigation expenses and costs; Interest as permitted by law; and such other and further relief including as the Court deems equitable and just under the circumstances.

### COUNT IV - VIOLATIONS OF 15 U.S.C. §1681e(b)
### AGAINST TRANS UNION

156.     Plaintiff incorporates by reference paragraphs 1, 3 – 5, 10, 13 – 72, 89 – 91, 93, 95, 97 – 101, 103 – 112, 118, 119, 121. 125, 126, 130, and 133 as if fully stated herein.

157.     At all times relevant hereto, Trans Union is and was a "consumer reporting agency" as provided for under the FCRA.

158.     At all times relevant hereto, Plaintiff was a "consumer" as provided for under the FCRA.

159.     Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit report and credit files it publishes and maintains concerning the Plaintiff.

160.     Any users of credit reports that viewed the Bridgecrest account saw the inaccurate and derogatory information associated with the account.

161.     Despite Plaintiff's disputes, Trans Union has continued reporting the Bridgecrest account inaccurately and does so presently.

162.     Trans Union's acts and/or omissions were willful, rendering it liable to Plaintiff for punitive damages pursuant to 15 U.S.C. §1681n.

163.     In the alternative, Trans Union negligently violated FCRA entitling Plaintiff to recover under 15 U.S.C. §1681o.

164.     As a result of Trans Union's failures to comply with the FCRA, Plaintiff has suffered damages including but not limited to, damages for mental and emotional distress associated with the Bridgecrest account remaining on his credit report following their disputes, loss of credit and the opportunity to benefit from credit, time spent dealing with credit report disputes, and the costs associated with disputes.

WHEREFORE, Plaintiff prays this Honorable Court to enter the following relief against Trans Union in the form of: Actual damages in an amount to be determined by the jury; Punitive damages in an amount to be determined by the jury; Statutory damages as determined by the Court; Attorneys' fees, litigation expenses and costs; Interest as permitted by law; and such other and further relief including as the Court deems equitable and just under the circumstances.

### COUNT V – VIOLATIONS OF 15 U.S.C. §1681i
### AGAINST EXPERIAN

165.     Plaintiff incorporates by reference paragraphs 1, 3 – 6, 11, 13 – 72, 89 – 92, 97, 106 – 109, 113, 114, 118, 119, 127 – 129, and 131 - 133 as if fully stated herein.

166.     At all times relevant hereto, Experian is and was a "consumer reporting agency" as provided for under the FCRA.

167.     At all times relevant hereto, Plaintiff was a "consumer" as provided for under the FCRA.

168.     Experian violated 15 U.S.C. § 1681i by failing to correct, update or delete inaccurate information in Plaintiff's credit file after receiving actual notice of inaccuracies contained therein. Experian also failed to add the consumer statement to Plaintiff's credit file, despite multiple requests.

169.     Additionally, Experian unreasonably relied on information provided by Bridgecrest, when readily verifiable information was provided by Plaintiff in the disputes placing Experian on notice that Bridgecrest's credit information was inaccurate and unreliable.

170.     Experian's acts and/or omissions were willful, rendering it liable to Plaintiff for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.

171.     In the alternative, Experian negligently violated the FCRA entitling Plaintiff to recover under 15 U.S.C. §1681o.

172.     As a result of Experian's violations of the FCRA, Plaintiff has suffered damages including but not limited to, damages for mental and emotional distress associated with the Bridgecrest account remaining on his credit report(s) following his dispute, loss of credit and the opportunity to benefit from credit, time spent dealing with credit report disputes, and the costs associated with disputes.

WHEREFORE, Plaintiff prays this Honorable Court to enter the following relief against Experian in the form of: Actual damages in an amount to be determined by the jury; Punitive damages in an amount to be determined by the jury; Statutory damages as determined by the Court; Attorneys' fees, litigation expenses and costs; Interest as permitted by law; and such other and further relief including as the Court deems equitable and just under the circumstances

## COUNT VI – VIOLATIONS OF 15 U.S.C. §1681e(b)
## AGAINST EXPERIAN

173.     Plaintiff incorporates by reference paragraphs 1, 3 – 6, 11, 13 – 72, 89 – 92, 97, 106 – 109, 113, 114, 118, 119, 127 – 129, and 131 - 133 as if fully stated herein.

174.     At all times relevant hereto, Experian is and was a "consumer reporting agency" as provided for under the FCRA.

175.     At all times relevant hereto, Plaintiff was a "consumer" as provided for under the FCRA.

176.     Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit report and credit files it publishes and maintains concerning the Plaintiff.

177.     Any users of credit reports that viewed the Bridgecrest account saw the inaccurate and derogatory information associated with the account.

178.     Despite Plaintiff's disputes, Experian has continued reporting the Bridgecrest account inaccurately and does so presently.

179.     Experian's acts and/or omissions were willful, rendering it liable to Plaintiff for punitive damages pursuant to 15 U.S.C. §1681n.

180.     In the alternative, Experian negligently violated the FCRA entitling Plaintiff to recover under 15 U.S.C. §1681o.

181.     As a result of Experian's failures to comply with the FCRA, Plaintiff has suffered damages including but not limited to, damages for mental and emotional distress associated with the Bridgecrest account remaining on his credit report(s) following his dispute, loss of credit and the opportunity to benefit from credit, time spent dealing with credit report disputes, and the costs associated with disputes.

WHEREFORE, Plaintiff prays this Honorable Court to enter the following relief against Experian in the form of: Actual damages in an amount to be determined by the jury; Punitive damages in an amount to be determined by the jury; Statutory damages as determined by the Court; Attorneys' fees, litigation expenses and costs; Interest as permitted by law; and Such other and further relief including as the Court deems equitable and just under the circumstances.

### COUNT VII – VIOLATIONS OF 15 U.S.C. §1681i
### AGAINST EQUIFAX

182.    Plaintiff incorporates by reference paragraphs 1, 3 – 6, 12, 13 – 72, 89 – 91, 93, 94, 96, 97, 106 – 109, 115 – 120, 122 – 124, and 133 as if fully stated herein.

183.    At all times relevant hereto, Equifax is and was a "consumer reporting agency" as provided for under the FCRA.

184.    At all times relevant hereto, Plaintiff was a "consumer" as provided for under the FCRA.

185.    Equifax violated 15 U.S.C. § 1681i by failing to correct, update or delete inaccurate information in Plaintiff's credit file after receiving actual notice of inaccuracies contained therein. Equifax also failed to add the consumer statement to Plaintiff's credit file, despite multiple requests.

186.    Additionally, Equifax unreasonably relied on information provided by Bridgecrest, when readily verifiable information was provided by Plaintiff in the disputes placing Equifax on notice that Bridgecrest's credit information was inaccurate and unreliable.

187.    Even after Plaintiff's disputes, the Bridgecrest account is still being reported on Plaintiff's credit reports.

188.    Equifax's acts and/or omissions were willful, rendering it liable to Plaintiff for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n.

189.     In the alternative, Equifax negligently violated the FCRA entitling Plaintiff to recover under 15 U.S.C. §1681o.

190.     As a result of Equifax's violations of the FCRA, Plaintiff has suffered damages including but not limited to, damages for mental and emotional distress associated with the Bridgecrest account remaining on his credit report(s) following their disputes, loss of credit and the opportunity to benefit from credit, time spent dealing with credit report disputes, and the costs associated with disputes.

WHEREFORE, Plaintiff prays this Honorable Court to enter the following relief against Equifax in the form of: Actual damages in an amount to be determined by the jury; Punitive damages in an amount to be determined by the jury; Statutory damages as determined by the Court; Attorneys' fees, litigation expenses and costs; Interest as permitted by law; and such other and further relief including as the Court deems equitable and just under the circumstances.

## COUNT VIII– VIOLATIONS OF 15 U.S.C. §1681e(b)
## AGAINST EQUIFAX

191.     Plaintiff incorporates by reference paragraphs 1, 3 – 6, 12, 13 – 72, 89 – 91, 93, 94, 96, 97, 106 – 109, 115 – 120, 122 – 124, and 133 as if fully stated herein.

192.     At all times relevant hereto, Equifax is and was a "consumer reporting agency" as provided for under the FCRA.

193.     At all times relevant hereto, Plaintiff was a "consumer" as provided for under the FCRA.

194.     Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit report and credit files it publishes and maintains concerning the Plaintiff.

195.     Any users of credit reports that viewed the Bridgecrest account saw the inaccurate and derogatory information associated with the account.

196.     Despite Plaintiff's disputes, Equifax has continued reporting the Bridgecrest account inaccurately and does so presently.

197.     Equifax's acts and/or omissions were willful, rendering it liable to Plaintiff for punitive damages pursuant to 15 U.S.C. §1681n.

198.     In the alternative, Equifax negligently violated the FCRA entitling Plaintiff to recover under 15 U.S.C. §1681o.

199.     As a result of Equifax's failures to comply with the FCRA, Plaintiff has suffered damages including but not limited to, damages for mental and emotional distress associated with the Bridgecrest account remaining on his credit report(s) following their disputes, loss of credit and the opportunity to benefit from credit, time spent dealing with credit report disputes, and the costs associated with disputes.

WHEREFORE, Plaintiff prays this Honorable Court to enter the following relief against Equifax in the form of: Actual damages in an amount to be determined by the jury; Punitive damages in an amount to be determined by the jury; Statutory damages as determined by the Court; Attorneys' fees, litigation expenses and costs; Interest as permitted by law; and Such other and further relief including as the Court deems equitable and just under the circumstances.

## JURY DEMAND

200.     Plaintiff demands a trial by jury on all issues so triable.


Dated: November 25, 2024                    *Respectfully submitted,*

**DEBT SHIELD LAW**
*/s/ Kevin Rajabalee, Esq.*
Fla. Bar. No. 119948
3440 Hollywood Blvd., Suite 415
Hollywood, FL 33021
Main: 754-800-5299
Direct: 954-667-3096
Fax: 305-503-9457
kevin@debtshieldlaw.com
dayami@debtshieldlaw.com
service@debtshieldlaw.com
*Attorney for Plaintiff*